**UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

_____

**No. 98-21032**

_____

**BARBRA PIOTROWSKI,**

**Plaintiff-Appellee-Cross-Appellant,**

**v.**

**CITY OF HOUSTON, ET AL.,**

**Defendants,**

**CITY OF HOUSTON**

**Defendant-Appellant-Cross-Appellee.**

Appeals from the United States District Court for the
Southern District of Texas

January 17, 2001

Before JONES, BARKSDALE, and DENNIS, Circuit Judges.[*]

EDITH H. JONES, Circuit Judge:

Barbra Piotrowski ("Piotrowski") sued the City of Houston ("City") for constitutional violations arising from its failure to prevent her wealthy former boyfriend from attempting to kill her. Implicated in the boyfriend's plot was an unsavory private investigator who had cultivated police and political friendships and regularly hired off-duty officers to work for him and the

---

[*] Judge Dennis dissents, reserving the right to file a dissenting opinion at a later date.

boyfriend. In exchange for the detective's favors, officials in the Houston Police Department allegedly covered up his and their coworkers' misdeeds. Piotrowski persuaded a jury that the City is liable for her shooting, and she was awarded a judgment of over $20 million. The City has appealed on numerous grounds. This court finds that despite the misconduct of several City employees, the evidence does not support municipal liability or liability based on a state-created danger theory. Additionally, the statute of limitations ran on Piotrowski's equal protection claim. We reverse and render judgment in favor of the City.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

This is a disturbing case -- both in terms of what happened to Piotrowski and how members of the Houston Police Department ("HPD") conducted themselves before and after the shooting. Piotrowski was shot and rendered a paraplegic by a hit man procured by her ex-boyfriend, Richard Minns. The evidence connected members of the Houston police and fire departments to Minns and his hired investigator Dudley Bell in acts that harassed and threatened Piotrowski before the shooting.

Piotrowski first met Minns while on a ski trip in Aspen, Colorado during the winter of 1976. She was then a twenty-three year old nursing student from California; Minns was a forty-six year old married Texas multi-millionaire, and was the founder of

2

President and First Lady health clubs.  Minns was in the process of divorcing his first wife.  In the spring of 1977, Minns persuaded Piotrowski to move to Houston, and the two began living together.  During this period, Piotrowski worked as a business consultant and model for Minns's health clubs.

During the roughly three years they lived together, their relationship deteriorated.  According to Piotrowski, Minns started attending wild parties and taking drugs.  He became increasingly violent toward her, physically abusing her on at least two occasions.  One of his blows broke her nose and hand.  In March 1980, the relationship ended.  Piotrowski had become pregnant.  Minns, during an argument, began to push her and told her to have an abortion or move out.  Piotrowski packed up her belongings and left Minns's Houston apartment.

Minns continued to harass Piotrowski after she left him.  The harassment took a variety of forms -- threatening Piotrowski and her family, filing frivolous charges against her, vandalizing her property as well as her attorney's office, and even placing a stalling device on her car.  But what makes this domestic dispute especially unusual is that Minns used the services of at least two members of the HPD as well as one member of the Houston Fire Department to harass Piotrowski.

Initially, Minns contacted Mickey Brown, a member of the Houston Arson Department who also taught boxing to Minns's

3

children, to concoct an arson charge against Piotrowski. Brown, in turn, contacted Detective "Spider" Fincher of the HPD to discuss possible theft charges against Piotrowski. Fincher worked off duty for Dudley Bell, the central figure in Piotrowski's case. Bell was a private investigator with his own criminal record.[2] Bell arranged the murder contract on Piotrowski.

Fincher telephoned Piotrowski and told her she would be arrested for arson and for felony grand theft (relating to items Piotrowski took with her upon leaving Minns's apartment) unless she signed a document releasing Minns from all common law marriage and paternity claims. Brown threatened her with the arson charge if she did not sign such an agreement.[3]

Piotrowski tried to reach a settlement with Minns. But instead of waiting for her to review a proposed agreement, Minns and Bell, with help from their contacts at the HPD, decided to put more pressure on Piotrowski. Minns invited Piotrowski to meet at his hotel so that the two could work out their differences. Piotrowski agreed. Once at the hotel, though, Minns summoned the

---

[2] Bell's criminal history included charges and/or convictions for arson, wiretapping, federal perjury, and bribing a police officer to mis-file the criminal records of one of Bell's clients. In 1972, Bell owned a night club with the then-Chief of the Fire Department. When the club burned down, the Fire Chief allegedly had arson charges against Bell dismissed. Bell was also known to have other friends in the HPD as well as in Houston politics.

[3] Brown allegedly claimed that Piotrowski had tried to blow Minns up by exposing electrical wires in their apartment and (somehow) rigging a toilet such that methane and other gases would build up in the home. When Minns turned on the lights, the gases would ignite, killing Minns.

4

police to arrest Piotrowski on the theft charges -- based on an arrest warrant that Minns had in his possession. Minns invited the officers at the scene to contact Fincher and HPD Detective Charles Wells, who also worked part-time for Bell, if the officers doubted the warrant's authenticity. Given the unique circumstance that the complainant possessed the warrant, the surprised officers accepted Minns's offer. After receiving assurances of authenticity from either Fincher or Wells, on duty at HPD, the officers arrested Piotrowski.

Piotrowski was interrogated at an HPD station by Fincher and Wells, who produced the settlement agreement and told her that she could avoid theft charges by signing it. She refused. As a result, she was fingerprinted, photographed and forced to spend time in jail before being released.

Shortly after being released, Piotrowski was returning to her apartment from a friend's birthday party. Upon arriving at her residence, she became alarmed that Minns, Bell, Fincher, and Wells (among others) were gathered outside. Piotrowski attempted to call her lawyer from a public phone. Officer Wells prevented her from completing the call and escorted her to her apartment, which he and Fincher and Minns then searched. Minns directed the men to remove various items that he claimed were his. Although Wells and Fincher implied that they had a search warrant, Piotrowski never saw it. Bell remained in the parking lot during the search and allegedly

5

vandalized and slashed the tires on the cars of Piotrowski and her attorney.

Toward the end of April 1980, Piotrowski filed a formal complaint with HPD's Internal Affairs Division ("IAD") about the conduct of Fincher and Wells.[4]  In fact, Piotrowski and her family filed several complaints with the HPD about the conduct of Minns, Bell, Fincher, and Wells in the months after she moved out of Minns's apartment.  The complaints identified those men as the perpetrators of harassment and intimidation, and Piotrowski stated that Minns had threatened her life on several occasions.  The HPD informed Piotrowski that they had investigated the various charges and found no wrongdoing by the police officers.  Thus, despite her protests, no action was taken to stop the harassment or to discipline Fincher and Wells.

In May the office of Piotrowski's attorney was burglarized and set on fire.  Files pertaining to Piotrowski's case were removed.  At about this time, Minns directed Bell to rent an apartment below Piotrowski's in order to keep track of her.  From

---

[4]    During this time, Minns and his associates also harassed Piotrowski's family.  Minns and Brown contacted Piotrowski's father, telling him that his daughter might go to prison if he did not convince her to work things out with Minns.  A business partner of Minns told Piotrowski's father that she would get $20,000 if the father would convince his daughter to leave Texas.  On another occasion, Bell and Wells traveled to California and searched the home of Piotrowski's parents, apparently without a warrant.  Posing as IRS agents, they detained Piotrowski's mother and her guests, searched the house for property belonging to Minns, and even took a necklace off of the mother's neck.  Piotrowski's parents filed IAD complaints following these events.  No action was taken against Wells, and the necklace was never recovered.

6

this apartment, Adrian Franks, who worked for Bell, tapped Piotrowski's phone and recorded her calls.[5]  As Franks also monitored Piotrowski's comings and goings, he knew what she looked like and what car she drove.  While Franks was spying on Piotrowski, Bell offered him $10,000 to kill her.  Franks agreed. Bell supplied Franks with a packet of information on Piotrowski which included a police-style mug shot of her that could have been taken when she was interrogated by Fincher and Wells.

Franks installed a kill switch on Piotrowski's car in July.[6]  Fortunately, the device did not function properly. Piotrowski's car stalled, but she was not hurt.  The police initially thought the device was a bomb.  After determining that it was a kill switch, HPD investigators turned the matter over to the burglary and theft division -- the division in which Fincher and Wells worked.  Although Minns was listed as a suspect on at least one police report, Minns was never questioned about the incident. Piotrowski knew her life was in danger.

---

[5]     Franks began cooperating with the police in 1984 and his testimony helped to convict Bell of solicitation of capital murder for the attempt on Piotrowski, for which Bell was sentenced to 38 years in prison.  Franks also confessed to burglarizing the office of Piotrowski's lawyer but denied starting a fire in that building.  Franks was never charged with any offense related to Piotrowski's harassment.

[6]     Besides placing the kill-switch on Piotrowski's car, Franks testified that on another occasion he followed her on his motorcycle with a kitchen knife. After deciding that he would not kill her himself, Franks tried to "subcontract" the job to another man in Piotrowski's apartment complex, known as "Bobby." Bobby disguised himself and went to Piotrowski's apartment with a knife. Fortunately, Piotrowski was not home at the time, and Bobby did not make another attempt on her life.

Undeterred by Franks's failure, Bell shopped the murder contract to other would-be assassins. Bell spoke to at least three other people about killing Piotrowski: James Perry Dillard, Rick Waring, and Robert Jess Anderson. Anderson ultimately hired Nathaniel Ivery, the gunman, and Patrick Steen, the driver of the getaway car, to kill Piotrowski. On October 20, 1980, Ivery shot Piotrowski four times while she was sitting in her parked car outside a doughnut shop in Houston. The shooting paralyzed Piotrowski from the chest down. Ivery, Steen, Anderson, and Bell were all eventually convicted for their roles in the shooting.

Whether HPD was forewarned of the possible shooting was disputed at trial. Approximately five weeks before the shooting, Waring told his friend John Liles, an officer in the criminal intelligence division of the HPD, that Bell had solicited Waring and others to murder Piotrowski. According to Waring, Liles responded that the matter was now in police hands and that Waring should not warn Piotrowski.

Liles testified that he took the tip seriously and reported it to his supervisor, Lieutenant Reece. According to Liles, Reece prevented Liles from investigating the tip on his own and told Liles to submit a report to Captain Adams, the head of the

8

homicide division.[7]  Adams testified that he first became aware of the tip when Liles called him the morning after the shooting. Adams said that he never saw a report from Liles and would have acted on it had he seen it.  Detective Kenneth Ray Williamson, who headed HPD's investigation of the shooting, testified that he did not think that Liles ever wrote a report before the shooting given Liles's personal connections with Waring and Bell.

Despite assurances that the HPD was conducting a full investigation, Piotrowski maintains that the HPD was actually closing ranks and protecting Minns, Bell, Fincher, and Wells. Despite the facts that (1) Waring, Anderson, and Dillard all told Williamson that Bell had offered them $10,000 to kill Piotrowski, and (2) Bell's ex-wife turned over a note in Bell's handwriting that listed a dollar amount of $10,000 and Piotrowski's name, address, and type of vehicle, Bell was not charged with solicitation of capital murder until Franks offered to assist the police in 1984.  Minns was allowed to leave the country without ever being interrogated, subpoenaed, or charged in relation to the shooting of Piotrowski.

---

[7]  Although Liles contends that he did write and file such a report, the only reference to a murder-for-hire tip is an entry in a criminal intelligence division ("CID") log that ascribes a CID case number, refers to Liles's name, and includes the notation "solicitation of capital murder" with the date "9-8 of '80."  No officer, including Liles, was able to produce a copy of the report.

Piotrowski's suit against the City is based largely on a deposition given by Liles in early 1993 for another case.[8]  In that deposition, Liles charged that the homicide division "dropped the ball" on his tip by failing to warn Piotrowski.  He claimed that Reece prevented him and another officer from warning Piotrowski and that the HPD closed ranks to protect the officers involved in the investigation, especially those who had a close relationship with Bell.

Not until September 1993, after learning about the contents of Liles's deposition, did Piotrowski file her first lawsuit against the City.  Piotrowski alleged that the City violated 42 U.S.C. § 1983 by depriving her of due process and equal protection rights under the Constitution.  In particular, she asserted that the City violated substantive due process by maintaining a custom or policy that affirmatively helped Bell to carry out the attack on her.  She also alleged that the City denied her equal protection of the laws by discriminating against women in domestic violence disputes while favoring wealthy men in such suits.

---

[8]     Liles sued Williamson (and others) for libel for statements made in a book written about Piotrowski's case, entitled Sleeping with the Devil.  As part of that case, Liles's deposition was taken.  Piotrowski claims that Liles's deposition revealed new information to her about the HPD preventing Waring from warning her and the HPD's "code of silence" regarding possible mistakes in the investigation.  As discussed below, Piotrowski argues that she could not establish her § 1983 claim before receiving this information.

10

The district court granted the City's motion to dismiss the case with prejudice under Fed. R. Civ. P. 12(b)(6) on the ground that Piotrowski's complaint was time-barred. On appeal, this court held that fact issues existed on the statute of limitations, but it also observed that Piotrowski had failed to "allege that a causal link existed between a City policy or custom and the alleged state-created danger." *See* <u>Piotrowski v. City of Houston</u>, 51 F.3d 512, 517 (5th Cir. 1995) ("<u>Piotrowski I</u>"). While her pleading deficiency warranted dismissal, it was possible that Piotrowski could allege such a causal connection. Hence, this court modified the judgment to preserve Piotrowski's right to file an amended complaint.

Further procedural jockeying in the district court led Piotrowski to file a second lawsuit against the City in August 1995. In January 1998, a jury found for Piotrowski on her state-created danger and equal protection claims. The district court entered a judgment in excess of $26 million, including attorney fees.

The City timely appealed. Among many issues it has raised, we need discuss only the statute of limitations verdict and the questions surrounding municipal liability.

## II. ANALYSIS

A. <u>Statute of Limitations</u>

11

The City first contends that judgment as a matter of law should have been granted to reverse the jury's finding that Piotrowski's complaint was not time-barred.[9] The statute of limitations for a suit brought under § 1983 is determined by the general statute of limitations governing personal injuries in the forum state. *See* Pete v. Metcalf, 8 F.3d 214, 217 (5th Cir. 1993). Since Texas has a two year statute of limitations for personal injury claims, *see* Burrell v. Newsome, 883 F.2d 416, 418 (5th Cir. 1989),[10] Piotrowski had two years to file suit from the date her claim accrued.

Accrual of a § 1983 claim is governed by federal law: "Under federal law, the [limitations] period begins to run 'the moment the plaintiff becomes aware that he has suffered an injury or has sufficient information to know that he has been injured.'" Russell v. Bd. of Trustees, 968 F.2d 489, 493 (5th Cir. 1992)(quoting Helton v. Clements, 832 F.2d 332, 335 (5th Cir.

---

[9] This court reviews a district court's denial of a motion for judgment as a matter of law de novo, applying the same standard as the district court. *See* Rutherford v. Harris Count, Texas, 197 F.3d 173, 178 (5th Cir. 1999). The district court properly grants a motion for judgment as a matter of law only if the facts and inferences point so strongly in favor of one party that reasonable minds could not disagree. See id. at 179. "In ruling on a rule 50 motion based upon the sufficiency of the evidence, we 'consider all of the evidence -- not just that evidence which supports the non-mover's case -- but in the light and with all reasonable inferences most favorable to the party opposed to the motion.'" Information Communication Corp. v. Unisys Corp., 181 F.3d 629, 633 (5th Cir. 1999)(quoting Boeing Co. v. Shipman, 411 F.2d 365, 374 (5th Cir. 1969)(en banc)).

[10] *See also* Tex. Civ. Prac. & Rem. Code Ann. § 16.003(a) (Vernon Supp. 1998).

1987)), cert. denied, 507 U.S. 914, 113 S.Ct. 1266 (1993). A plaintiff's awareness encompasses two elements: "(1) The existence of the injury; and (2) causation, that is, the connection between the injury and the defendant's actions." Piotrowski I, 51 F.3d at 516. A plaintiff need not know that she has a legal cause of action; she need know only the facts that would ultimately support a claim. *See* Harrison v. United States, 708 F.2d 1023, 1027 (5th Cir. 1983). Actual knowledge is not required "if the circumstances would lead a reasonable person to investigate further." Piotrowski I, 51 F.3d at 516.[11]

The City argues that Piotrowski either knew of the facts underlying her claims at the time of the attack in 1980 or should have inquired into the actions of the police officers at that time. With respect to the state-created danger theory, Piotrowski responds that the HPD's "code of silence" precluded her from knowing pertinent facts until January 1993, when Liles was deposed in relation to his pending libel suit against Williamson and others. From that deposition, Piotrowski alleges that she learned for the first time that the HPD took affirmative steps to suppress

---

[11]    *See also* Jensen v. Snellings, 841 F.2d 600, 606 (5th Cir. 1988) ("Under federal law, the limitations period commences when 'the aggrieved party has either knowledge of the violation or notice of facts which, in the exercise of due diligence, would have led to actual knowledge' thereof." (quoting Vigman v. Community Nat'l Bank and Trust Co., 635 F..2d 455, 459 (5th Cir. 1981)))

13

any information concerning their investigation and the HPD's prior knowledge of the Waring tip.[12]

At trial, the City did not object to the form of the jury interrogatory that asked whether the plaintiff knew or should have known of the causal connection between her injuries and "the defendant's actions creating a state-created danger" on or before September 27, 1991 (two years before suit was filed). The jury decided that Piotrowski should not have known about the facts concerning causation before this time.[13]

There is sufficient evidence for the jury to have concluded that Piotrowski could not make a case for the City's possible affirmative involvement in the contract on her life until Liles's 1993 deposition. Only after the deposition could Piotrowski suspect that the City, as opposed to individual officers, had actively protected and/or assisted Bell. The

---

[12]    The City contends that Piotrowski had all the information relevant to her § 1983 claims shortly after she was shot. According to the City, Piotrowski knew the police (1) had received a tip (the book, Sleeping with the Devil, published in 1991, discussed this tip), (2) had not advised her of the tip, and (3) failed to prevent the attack on her. Piotrowski maintains that she did not know until after Liles's deposition that the City itself, as opposed to individual officers, had a policy of assisting Bell and keeping information from Piotrowski.

[13]    In cases where fraudulent concealment is involved, the statute of limitations does not begin to run until the relevant facts, which are in the control of the defendant, become known to the plaintiff: "When a defendant controls the facts surrounding causation such that a reasonable person could not obtain the information even with a diligent investigation, a cause of action accrues, but the statute of limitations is tolled." Piotrowski I, 51 F.3d at 517. See also United States v. Kubrick, 444 U.S. 111, 122, 100 S.Ct. 352, 359 (1979); Frazier v. Garrison Indep. Sch. Dist., 980 F.2d 1514, 1521-22 (5th Cir. 1993).

14

deposition revealed that: (1) Waring and Liles were deterred from warning her, (2) Franks had received a police mug shot of Piotrowski from Bell, and (3) the police had a "code of silence" with respect to the investigation into her shooting. (Whether such facts, if proved, were sufficient to sustain a claim is another matter, discussed infra.) Thus, Piotrowski's first action was timely filed, within eight months of her learning of the ostensible causal connection in January 1993.[14]

However, the same is not true for Piotrowski's equal protection claim, a claim not predicated on any facts learned from Liles's 1993 deposition. Piotrowski testified that, in 1980, she "didn't feel as if [she and Minns] were being treated equally," and that she "didn't feel as if [she] was being treated in the same manner that Richard Minns was being treated in response to [his] complaints." In fact, in an interview with an officer investigating one of her IAD complaints against Fincher and Wells, Piotrowski asked the officer "[w]hy all their protection is on

_____

[14] The doctrine of equitable tolling protects her second suit, filed in 1995, from untimeliness. When the applicable statute of limitations is borrowed from the state, that state's tolling provisions are to be the "primary guide" for the courts. FDIC v. Dawson, 4 F.3d 1303, 1312 (5th Cir.), cert. denied, 512 U.S. 1205, 114 S. Ct. 2673 (1993). Under Texas law, "where a person is prevented from exercising his legal remedy by the pendency of legal proceedings, the time during which he is thus prevented should not be counted against him in determining whether limitations have barred his right." Jackson v. Johnson, 950 F.2d 263, 265 (5th Cir. 1992)(citing Weisz v. Spindletop Oil and Gas Co., 664 S.W.2d 423, 425 (Tex. App.–Corpus Christi 1983, no writ)). Piotrowski was prevented from filing suit because the trial court had initially dismissed her claim with prejudice, a disability not removed until the decision of this court in Piotrowski I.

15

[Minns's] side." Piotrowski thus fails to explain what information in Liles's deposition was not known or could not have been discovered through due diligence. Although the deposition may have revealed information concerning the HPD's custom or policy of protecting and assisting Bell, the information is unrelated to Piotrowski's equal protection claim.[15] As a result, the equal protection claim is time-barred, and the judgment on that claim cannot be sustained.

        B.    <u>The City's Liability</u>

        1.    Municipal Policy and Culpability

Under the decisions of the Supreme Court and this court, municipal liability under section 1983 requires proof of three elements: a policymaker; an official policy; and a violation of constitutional rights whose "moving force" is the policy or custom. <u>Monell v. Dep't. Of Social Sciences</u>, 436 U.S. 658, 694, 98 S.Ct. 2018, 2037 (1978).[16] <u>Monell</u> and later decisions reject municipal

---

[15]    The equal protection clause requires that all persons similarly situated be treated alike. *See* <u>City of Cleburne, Texas v. Cleburne Living Center, Inc.</u>, 473 U.S. 432, 439, 105 S.Ct. 3249, 3254 (1989). In order to establish a violation of equal protection, a plaintiff must show "'the existence of purposeful discrimination' motivating the state action which caused the complained-of injury." <u>Johnson v. Rodriguez</u>, 110 F.3d 299, 306 (5th Cir. 1997)(quoting <u>McClesky v. Kemp</u>, 481 U.S. 279, 292-93, 107 S. Ct. 1756, 1767 (1987)). Piotrowski relies on Liles's deposition to establish that the HPD had a policy of protecting Bell and/or other members of the HPD. But Liles's deposition simply does not speak to intentional discrimination against Piotrowski based on an impermissible classification (be it wealth or gender).

[16]    The municipal policy must cause the violation of another's rights:

       [Section 1983] imposes liability on a government that, under color of some official policy, "causes" an

16

liability predicated on *respondeat superior*, because the text of section 1983 will not bear such a reading. Bd. of Comm'rs of Bryan County v. Brown, 520 U.S. 397, 403, 117 S.Ct. 1382, 1388 (1997). Consequently, the unconstitutional conduct must be directly attributable to the municipality through some sort of official action or imprimatur;[17] isolated unconstitutional actions by municipal employees will almost never trigger liability. Bennett v. City of Slidell, 728 F.2d 762, 768 n.3 (5th. Cir. 1984), *cert. denied*, 472 U.S. 1016 (1985); McKee v. City of Rockwall, 877 F.2d 409, 415 (5th Cir. 1989), *cert. denied*, 493 U.S. 1023 (1990).[18] The three attribution principles identified here – a policymaker, an official policy and the "moving force" of the policy – are necessary to distinguish individual violations perpetrated by local

---

> employee to violate another's constitutional rights ...
> Indeed, the fact that Congress did specifically provide
> that A's tort became B's liability if B "causes" A to
> subject another to a tort suggests that Congress did not
> intend § 1983 liability to attach where such causation
> was absent.

Monell, 436 U.S. at 692, 98 S.Ct. at 2036.

[17] Another way to put this is that there must be both municipal culpability and causation. *See* Snyder v. Trepagnier, 142 F.3d 791, 796 (5th Cir. 1998) (no liability for a city where a police officer shot a § 1983 plaintiff). Culpability includes both the involvement of a municipal policymaker and affirmative municipal action.

[18] *Compare* Grandstaff v. City of Borger, 767 F.2d 161 (5th Cir. 1985). This case is often mis-read as suggesting that municipal liability may be imposed for individual unconstitutional acts of lower-level employees. Grandstaff recognized that isolated instances of police misbehavior do not prove acquiescence by a city policymaker in that conduct. The court affirmed municipal liability, however, because the sheriff's actions after a police shooting essentially ratified the officers' use of excessive force.

17

government employees from those that can be fairly identified as actions of the government itself. Mistakes in analyzing section 1983 municipal liability cases frequently begin with a failure to separate the three attribution principles and to consider each in light of relevant case law.

Here, for instance, the City never insisted that Piotrowski identify a municipal policymaker who could be held responsible, through actual or constructive knowledge, for enforcing a policy that caused Piotrowski's injuries. This is not an opaque requirement: several Supreme Court cases have discussed the policymaker criterion for municipal liability.[19] This court's seminal decision on municipal section 1983 liability emphasized that:

> Actual or constructive knowledge of [a] custom must be attributable to the governing body of the municipality or to an official to whom that body has delegated policy-making authority.

Webster v. City of Houston, 735 F.2d 838, 842 (5th Cir. 1984) (en banc).[20]

Webster identified the Mayor, City Council and Chief of Police as Houston's presumptive policymakers for the police, and stated that

---

[19] *See*, e.g., Jett v. Dallas Independent School District, 491 U.S. 701, 737 (1989); St. Louis v. Prapotnik, 485 U.S. 112, 126 (1988); Pembaur v. City of Cincinnati, 475 U.S. 469, 482-83 (1986).

[20] Plainly, if a violation is caused by an unconstitutional ordinance or regulation officially adopted and promulgated by the municipality's lawmaking officers or by an official who has been delegated policymaking authority, those individuals are the policymakers. Webster, 735 F.2d at 841.

18

without proof, it was inconceivable that any officers subordinate to the Chief "even possibly could have occupied the role of a city policymaker."  Webster, 735 F.2d at 842.  Since the City chose not to pursue this angle of defense, no more need be said of it.

Instead, the City rests on the other two attribution principles, those of official policy and moving force, contending that insufficient evidence supports the verdict on these issues and that the jury charge was inadequate.  To examine these contentions, it is necessary to sketch the rules governing municipal policy and causation of constitutional injuries and then to apply those rules to each of the policies subsumed by Piotrowski's claim.

Municipal liability for section 1983 violations results if a deprivation of constitutional rights was inflicted pursuant to official custom or policy.  Official policy is ordinarily contained in duly promulgated policy statements, ordinances or regulations. But a policy may also be evidenced by custom, that is:

> (2). . . . a persistent, widespread practice of City officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well-settled as to constitute a custom that fairly represents municipal policy. . . Actions of officers or employees of a municipality do not render the municipality liable under section 1983 unless they execute official policy as above defined.

Webster, 735 F.2d at 841; *See also* Bryan County, 520 U.S. at 405-07, 117 S.Ct. at 1387.

19

While an unconstitutional official policy renders a municipality culpable under § 1983,[21] even a facially innocuous policy will support liability if it was promulgated with deliberate indifference to the "known or obvious consequences" that constitutional violations would result. <u>Bryan County</u>, 520 U.S. at 407, 117 S.Ct. at 1389, 1390.[22] Deliberate indifference of this sort is a stringent test, and "a showing of simple or even heightened negligence will not suffice" to prove municipal culpability. *See id.* It follows that each and any policy which allegedly caused constitutional violations must be specifically identified by a plaintiff, and it must be determined whether each one is facially constitutional or unconstitutional.

In addition to culpability, there must be a direct causal link between the municipal policy and the constitutional deprivation. <u>Monell</u> describes the high threshold of proof by stating that the policy must be the "moving force" behind the violation. <u>Monell</u>, 436 U.S. at 694, 98 S.Ct. at 2037-2038. *See*

---

[21] *See* n.18, *supra; see also* <u>City of Newport v. Fact Concerts</u>, 453 U.S. 247 (1981).

[22] "[A] plaintiff seeking to establish municipal liability on the theory that a facially lawful municipal action has led an employee to violate a plaintiff's rights must demonstrate that the municipal action was taken with 'deliberate indifference' to its known or obvious consequences." <u>Bryan County</u>, 520 U.S. at 407, 117 S.Ct. at 1390 (citing <u>Canton v. Harris</u>, 489 U.S. 378, 388 (1989).

20

*also* <u>Canton</u>, 489 U.S. at 389.  This court summed up the relevant standards as follows:

> <u>Bryan County</u> underscores the need for <u>Monell</u> plaintiffs to establish both the causal link ("moving force") and the City's degree of culpability ("deliberate indifference" to federally protected rights).  These requirements must not be diluted, for "[w]here a court fails to adhere to rigorous requirements of culpability and causation, municipal liability collapses into respondeat superior liability."

<u>Snyder v. Trepagnier</u>, 142 F.3d at 796, citing <u>Bryan County</u>, 520 U.S. at 410, 117 S.Ct. at 1394.

Unfortunately, Piotrowski's specification of the policies she challenges has been vague, and she has hardly addressed their constitutionality.[23]  The City denies that any policy or custom is at all tied to Piotrowski's injuries and instead tries to lay the blame on the misconduct of rogue officers.  The jury charge did nothing to sort out the policies or the requirement of deliberate indifference or to connect each policy as the moving force behind

---

[23]    Piotrowski's reliance on a Title VII retaliation case, <u>Sharp v. City of Houston</u>, 164 F.3d 923 (5th Cir. 1999), to prove the existence of a municipal custom or policy in this case is misplaced.

a constitutional violation.[24] Our task in analyzing the sufficiency

of evidence on appeal is immensely more complex than it should be.[25]

What we glean from Piotrowski's briefs and the record are

several alleged customary policies:

> (1) The City's acquiescence in off-duty employment of Officers Fincher, Wells and others by Dudley Bell, a known criminal, and Richard Minns;[26]
>
> (2) the City's failure to investigate properly or discipline Fincher and Wells based on Piotrowski's complaints of their improper acts in California; threats of prosecution; pressure to sign an agreement with Minns; irregular search of her apartment; and false arrest;
>
> (3) the City's failure to charge Bell or Minns for their offenses against Piotrowski, including illegal searches, baseless prosecutions, arson, wiretapping, the installation of the kill switch on her car, vandalism and theft; and
>
> (4) the City's affirmative assistance to the attempted murder of Piotrowski by not investigating the kill switch incident, handing out her mug shot, and suppressing

---

[24]  Instead, the jury was asked to find only whether "as a result of a custom, policy or practice, the [City] violated the Plaintiff's civil rights by creating a "state created danger," which resulted in injury to the Plaintiff." No specific custom, policy or practice was identified in the charge or interrogatories.

[25]  The test that we apply for reviewing the sufficiency of the evidence is the Boeing standard in n.7 *supra*.

[26]  The City persists in asserting that such off-duty employment violated HPD policies, but that position is belied by the evidence that many people in the Department were aware of these officers' connection with Dudley Bell and with Bell's hiring of other HPD officers.

22

Waring's and Liles's attempts to warn her and investigate the hit contract.[27]

The reason the policies or customs must be disaggregated should be clear.  Taken together, they express no single municipal policy but only a series of adversarial conclusions by Piotrowski (e.g., "the Houston Police Department was up for sale in 1980") relating to her individual case.  "Isolated violations are not the persistent, often repeated, constant violations, that constitute custom and policy as required for municipal section 1983 liability."  Bennett v. City of Slidell, 728 F.2d 762, 768 n.3 (5th Cir. 1984), *cert. denied*, 472 U.S. 1016, 105 S.Ct. 3476 (1985).  A customary municipal policy cannot ordinarily be inferred from single constitutional violations.  *See, e.g.*, Webster, 375 F.2d at 851.  Further, each of the cited customs concerns a discrete police department program or area of decision-making, and each invokes separate aspects of the policy issue.  Finally, each alleged policy may have had a distinct impact as the moving force of her state-created danger claim.  In Bryan County, for example, the Court carefully distinguished between municipal liability for failure to

---

[27]    None of these "policies" was specifically distinguished in the jury charge or interrogatories, and because Piotrowski's closing arguments were colloquial, the policies were not carefully articulated there either.  With one exception, the City did not insist upon greater clarity.  It is imperative that the policies for which municipal section 1983 liability is sought be specified in the trial court.  Otherwise, the line between respondeat superior liability and truly unconstitutional municipal conduct quickly blurs, and the intent of section 1983 is forsaken.  *See* Snyder, 142 F.3d at 796.

23

train and liability for a single negligent hiring decision. *See* Bryan County, 520 U.S. at 398, 117 S.Ct. at 1391.

Turning first to the City's acquiescence in police officers' moonlighting for Dudley Bell, a policy appears to have been proven. As the touchstone for establishing customary policy is a persistent and widespread practice, *see* Webster, 735 F.2d at 841, the evidence suggested that Bell had hired off-duty policemen, not just Fincher and Wells, for many years notwithstanding official police department policy that would have discouraged their employment by any man with a criminal record. This customary policy represented the height of poor judgment, inasmuch as it invited conflicts of interest if and when the police department should have to investigate Bell, his employees, or the clients of his private investigation firm. Poor judgment is not, however, facially unconstitutional. The City could only be liable for Fincher's and Wells's moonlighting if it was deliberately indifferent to known consequences such as the likelihood that the officers would assist Bell in committing crimes. The City failed to insist upon proof of deliberate indifference, however, so that standard is waived.

Assuming, then, that the moonlighting policy did demonstrate deliberate indifference, the evidence is nevertheless insufficient to establish that it was the moving force that caused

24

Piotrowski to be shot, or that it resulted in a "state created danger" to her life. None of Dudley Bell's previous misdeeds were contract killings. As a private investigator and bodyguard, surveillance and protective duties could be expected of his employees. Abuses of these services could foreseeably result in the wiretapping, vandalism, and false charges to which Piotrowski was exposed. But there is no evidence that the City could have been deliberately indifferent to the likelihood that officers moonlighting for Bell would get involved in murder for hire, and there is also no evidence that Fincher or Wells knew of or had any role in Bell's attempt to have Piotrowski killed. The municipal policy allowing improper moonlighting employment may have been culpable, but causation was not established.

The second alleged policy resides in the City's failure to investigate and discipline Fincher and Wells when Piotrowski and her family made several IAD complaints about them. On the facts of this case, no unconstitutional municipal custom or policy was proven. Self-evidently, a City policy of inadequate officer discipline could be unconstitutional if it was pursued with deliberate indifference toward the constitutional rights of citizens. The question is how to prove the existence of such a policy. One indication might be a purely formalistic investigation in which little evidence was taken, the file was bare, and the conclusions of the investigator were perfunctory. No such

25

deficiency appears on the record before us. The IAD investigator responded to lengthy complaints by or on behalf of Piotrowski, received nearly as lengthy responses from Fincher and Wells, and reviewed relevant police department records like the search warrant. Regardless whether one agrees or disagrees with the IAD conclusions exonerating Fincher and Wells, the IAD file reveals no systematic inattention to the complaints.

A more fundamental point is that the failure to discipline arises only from this plaintiff's and her associates' allegations against the officers. Piotrowski did not offer evidence of any other IAD complaints made against Fincher and Wells. There is no pattern of complaints by other citizens. As is the case with allegations of failure to adequately screen prospective police officers, it is nearly impossible to impute lax disciplinary policy to the City without showing a pattern of abuses that transcends the error made in a single case. *See* Bryan County, 520 U.S. at 410-11, 117 S.Ct. at 1391. A pattern could evidence not only the existence of a policy but also official deliberate indifference.

The City did preserve error to the jury charge on this policy, as it requested a deliberate indifference instruction if the jury was instructed that it could find liability for the City's failure to act to prevent the misdeeds of its police officers.

26

Consequently, even if we concluded that an unconstitutional policy of inadequate discipline was sufficiently proved, we would have to reverse any judgment predicated on this theory because of the court's error in omitting the deliberate indifference charge. This asserted policy fails, however, for lack of proof of a pattern of unremedied abuses of citizens' rights by Fincher and Wells.

The third alleged policy is that the police failed to bring charges against Bell or Minns at Piotrowski's urging. At one point, she implied to the jury that her tormentors would have been locked up and would not have been free to plan her murder had the police taken action in the first half of 1980. Tragic though it is in hindsight when the police fail to enforce the law strictly against wrongdoers, decisions not to prosecute cannot be the subject of policy determinations for purposes of section 1983 liability. *See generally* Pinder v. Johnson, 54 F.3d 1169 (4th Cir. 1995) (en banc). The DeShaney decision absolves public officials of individual section 1983 liability for failure to protect citizens absent a "special relationship" such as official custody of the victim. *See* DeShaney v. Winnebago Cty. Dep't of Social Servs., 489 U.S. 189, 201 (1989); Walton v. Alexander, 44 F.3d 1297, 1298 (5th Cir. 1995) (en banc). A city cannot be liable to a member of the public for failing to prosecute a known wrongdoer

27

if no individual City employee could be liable constitutionally for the same neglect.[28]

Finally, Piotrowski charged that City policy extended even to the unthinkable -- its affirmative assistance of Bell's carrying out a murder contract on her life. This appears to be the essence of what the jury charge described as a City custom or policy which created a state-created danger. There is no evidence, however, that any action of any individual City employee, much less official custom or policy of the City, so assisted Bell.

The existence of this alleged policy turns on two facts. First, Franks testified that Bell gave him a police mug shot to use in identifying Piotrowski. Where the mug shot came from, who gave it to Bell and for what purpose it might have been given to him, are left unexplained by the record. Hence there is no evidence on which to base an adverse inference about the City's custom or policy.

Second, the jury evidently believed Officer Liles's testimony that he reported the threat of a hit contract both to Lieutenant Reece and to the homicide division. Lieutenant Reece told him not to get involved personally, and the homicide division lost Liles's report. Piotrowski was not officially warned of the

---

[28] As stated in <u>DeShaney</u> of course, a different situation might result from the wholesale failure to protect a class of people, e.g. minorities, 489 U.S. at 197, n.3, 109 S.Ct. at 1004 n.3.

28

murder contract, and no investigation took place before the homicide attempt. But again, there is no record evidence of any connection between Lieutenant Reece or members of the homicide division and Minns or Bell. On the contrary, the only evidence of police misconduct involved Fincher and Wells, who intervened against Piotrowski repeatedly -- short of participating in the murder contract -- as they provided inside-the-HPD assistance to their off-duty employer Bell when he harassed Piotrowski. Even as to Fincher and Wells, there is no evidence that they knew of or assisted in the attempted murder.

Piotrowski made a compelling case that Bell cultivated friendships in Houston's political community, among police and fire department officials, and even with judges, and that some of these relationships may have contributed to his avoiding or minimizing prosecution for some illegal acts. But pinning affirmative involvement by the City in Piotrowski's attempted murder is beyond the inferences afforded in this record.[29]

---

[29] In her brief, Piotrowski also asserts that the "cooperation between HPD and Bell" led the department to (a) advise Bell that his kill-switch plan had been thwarted; (b) stop any investigation of the kill-switch; (c) stop Waring from warning Piotrowski of her danger; and (d) deliberately refuse to pursue leads against Minns and Bell. None of these charges adds to the case for a City policy related to the hit contract. First, Bell did not need to be tipped off to the kill-switch plan -- Piotrowski had obviously survived it. Second, Fincher and Wells apparently diverted the kill-switch investigation to their division, but there is no evidence of involvement by other police officers in this act. Third, it was Liles who told Waring not to warn Piotrowski – Liles was no pawn of an allegedly corrupt police department. Fourth, failure to pursue leads against Minns and Bell is unsustained on this record (prior to the shooting) apart from the proven inaction of Fincher and Wells. These facts suggest misconduct by Fincher and Wells, not a general custom or widespread policy within

29

After considering all four of the policies that Piotrowski alluded to at trial, we must conclude that none of them furnishes a basis for finding that the City maintained a wide-spread custom or policy that caused Piotrowski's injuries. No one could fail to be moved by the suffering that she has endured or would hesitate to condemn the police department's unwillingness to keep its officers from compromising off-duty employment. Difficult as these facts are, however, they do not suffice to carry the heavy burden that a plaintiff must bear in establishing municipal culpability and causation.

2.   State created danger theory

Piotrowski persuaded the jury that unspecified customs or policies of the City effected a "state-created danger," causing her to be injured by third parties. For purposes of this discussion, we assume *arguendo* that "the City" could have been the unconstitutional actor. Even assuming such an anthropomorphization, however, Piotrowski's evidence was fatally deficient.

In general, local governments are under no duty to provide protective services: "[T]he Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests

the police department.

30

of which the government itself may not deprive the individual ...
[Thus,] a State's failure to protect an individual against private
violence simply does not constitute a violation of the Due Process
Clause." <u>DeShaney v. Winnebago County Dep't of Social Servs.</u>, 489
U.S. 189, 196-97, 109 S.Ct. 998, 1003-04 (1989).[30] The Constitution
imposes a duty on the state to protect particular individuals only
in "certain limited circumstances." *Id.*, 489 U.S. at 198, 109
S.Ct. at 1004. Courts have recognized at most two such limited
circumstances -- when the state has a special relationship with the
person or when the state exposes a person to a danger of its own
creation.[31]

Piotrowski argues that the City violated the Due Process
Clause by failing to protect her from a danger that it created by
affirmatively assisting Bell. Although this court has discussed
the contours of the "state-created danger" theory on several
occasions, we have never adopted that theory. *See* <u>Randolph v.
Cervantes</u>, 130 F.3d 727, 731 (5th Cir. 1997), cert. denied, 525
U.S. 822, 119 S.Ct. 65 (1998); <u>Doe v. Hillsboro Indep. Sch. Dist.</u>,

---

[30]    *See also* <u>Walton v. Alexander</u>, 44 F.3d 1297, 1302 (5th Cir. 1995)(en
banc): "The due Process Clause confers protection to the general public against
unwarranted governmental interference, but it does not confer an entitlement to
governmental aid as may be necessary to realize the advantages of liberty
guaranteed by the Clause."

[31]    This court's decision in <u>Walton</u> precludes Piotrowski from arguing
that the HPD's actions created a special relationship that required the police
to protect her. Under <u>Walton</u>, a special relationship exists only if the
plaintiff is "involuntarily confine[d] against [the plaintiff's] will through
affirmative exercise of state power." 44 F.3d at 1306.

31

113 F.3d 1412, 1415 (5th Cir. 1997)(en banc); <u>Piotrowski I</u>, 51 F.3d at 515. We need not do so here, since, even if we were to adopt it, Piotrowski could not recover.

In <u>Piotrowski I</u>, this court set out the basic requirements of the state-created danger theory: "First, a plaintiff must show that the state actors increased the danger to her. Second, a plaintiff must show that the state actors acted with deliberate indifference." 51 F.3d at 515.

Piotrowski alleged that the City created a danger by allowing its employees to affirmatively assist Bell in carrying out the attack on her. The facts have been summarized. The initial problem is that no matter what official protection Bell received, the City actors did not create the danger she faced. *See* <u>Armijo v. Wagon Mound Public Schools</u>, 159 F.3d 1253, 1263 n.7 (10th Cir. 1998) ("[i]f the danger to the plaintiff existed prior to the state's intervention, then even if the state put the plaintiff back in that same danger, the state would not be liable because it could not have created a danger that already existed."). During her relationship with Minns, Minns became more violent and started using drugs. Minns had physically abused her at least twice while they lived together, breaking her nose and hand on one such occasion. Piotrowski also testified that Minns asked her to help him kill his first wife. Shortly after moving out of Minns's

32

apartment, Piotrowski knew that her life was in danger.  The record clearly demonstrates that Piotrowski was aware of Minns's propensity for violence given the various threats and acts of vandalism directed at Piotrowski, her attorney, and her family. According to a police report she filed, Minns had threatened her life on several occasions.  And after the kill-switch incident, Piotrowski knew that Minns was trying to kill her.[32]  Unlike other cases in which government officials placed persons in danger, the City at most left her in an already dangerous position.

Depending on the facts, some cases interpret the state-created danger theory to result in § 1983 liability if government actors increase the danger of harm to a private citizen by third parties.  Measured by this standard, the assistance provided to Bell consisted of furnishing Piotrowski's mug shot and failing to warn her of Waring's tip. Neither of these circumstances, however, actually increased the danger to her.  The kill switch incident plainly signaled Minns's intentions and determination.  And in the summer of 1980, before Waring's tip to Liles, Piotrowski's attorney had arranged bodyguard protection for her.

Moreover, the City did not act with deliberate indifference.  To establish deliberate indifference, "[t]he

---

[32]    After the kill-switch was discovered, Piotrowski told investigators that she believed Minns was responsible for this attempt on her life. The police report even listed Minns as a suspect.

33

environment created by the state actors must be dangerous; they must know it is dangerous; and ... they must have used their authority to create an opportunity that would not otherwise have existed for the third party's crime to occur." Johnson v. Dallas Indep. Sch. Dist., 38 F.3d 198, 201 (5th Cir. 1994). "The key to the state-created danger cases ... lies in the state actors' culpable knowledge and conduct in affirmatively placing an individual in a position of danger, effectively stripping a person of her ability to defend herself, or cutting off potential sources of private aid." *Id*. (quotations and citations omitted). As has been discussed, there is no evidence that City actors knew of or participated in the murder contract, and they did nothing to prevent her from protecting herself.[33]

For all these reasons, Piotrowski was the shooting victim of Richard Minns and Dudley Bell, not of circumstances created by the City actors.

---

[33] Piotrowski's case is, therefore, markedly different from cases in other jurisdictions in which the municipal employees created the dangerous situation and precluded the plaintiff from protecting herself. *See, e.g.*, Wood v. Ostrander, 879 F.2d 583 (9th Cir. 1989), cert. denied, 498 U.S. 938, 111 S.Ct. 341 (1990)(woman raped after police arrested the drunk driver of the vehicle she was in and left her alone at night in a high crime area); Cornelius v. Town of Highland Lake, 880 F.2d 348 (11th Cir. 1989), cert. denied, 494 U.S. 1066, 110 S.Ct. 1784 (1990)(female city employee abducted by prisoner with a violent criminal history who was placed in an inmate work program at the town hall where she worked); White v. Rochford, 592 F.2d 381 (7th Cir. 1979)(children left by police officers alone in car on busy road after arresting driver).

## IV. CONCLUSION

Because Piotrowski failed to establish the grounds for municipal § 1983 liability and the state-created danger theory of substantive due process violation, and because her equal protection claim was time-barred, we must reverse and render the judgment. Nothing in this opinion should be taken as excusing or condoning any involvement by policemen or firefighters with men like Dudley Bell and Richard Minns.

**REVERSED** and **RENDERED**.